# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **BERT NEWBY and MONTEZ ADAMS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:14-cv-01750** |
| | ) | **Judge Sharp / Knowles** |
| **TENNESSEE DEPARTMENT OF** | ) | |
| **CORRECTION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court upon two Motions: the first, a "Partial Motion to Dismiss

for Defendants Chapman, Spears, Hininger and Corrections Corporation of America" (hereinafter

collectively referred to as "CCA Defendants"); and the second, a "Motion to Dismiss on Behalf

of Defendants Derrick Schofield, Tony Parker, and the Tennessee Department of Correction"

(hereinafter collectively referred to as "TDOC Defendants").[1]  Docket Nos. 83, 111.  Both

Motions are supported by Memoranda of Law.  Docket Nos. 84, 112.

Plaintiffs have filed a Response to CCA Defendants' Partial Motion to Dismiss, and a

Response and unsigned supporting Memorandum of Law responding to TDOC Defendants'

Motion to Dismiss.  Docket Nos. 104, 115, 116.

Plaintiffs are TDOC inmates who, at all times relevant to the instant action, have been

housed at South Central Correctional Facility ("SCCF"), a facility run by CCA, a private

---

[1] Centurion Medical Provider was terminated as a party to this action on January 6, 2015, when Clinical Services was substituted in its place.  Docket No. 44.  At the time of the filing of the instant Motions, Clinical Services had not yet been served.  Accordingly, Clinical Services is not a party to the instant Motions.

company that contracts with the State to run penal facilities.  Docket No. 38, Complaint. Plaintiffs filed this pro se, in forma pauperis action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated various Eighth and Fourteenth Amendment rights, including lack of access to quality library facilities, denial of access to courts, denial of adequate recreational facilities, denial of proper nutrition, denial of reasonable expectation of safety as relates to prison violence, denial of adequate medical care, "exposure to dangerous and volatile chemicals," and general violations of due process and equal protection.  *Id.*

Plaintiffs sue TDOC as "the governing agency responsible for the maintenance and care of all State of Tennessee Prisons"; CCA as "the privately contracted agency responsible for the maintenance and care of all facilities under their watch, to include SCCF"; Trinity Food Services as "the contracted agency responsible for the maintenance and care of meal planning and presentation at SCCF"; Derrick Schofield,"the Commissioner of Prisons for the State of Tennessee" who "is responsible for the maintenance and care of all State of Tennessee Prisons"; Tony Parker, "the Assistant Commissioner of Prisons for the State of Tennessee" who "is responsible for the maintenance and care of all State of Tennessee Prisons"; Damon Hininger, "the President and CEO of the [CCA]" who "is responsible for the care and maintenance of all CCA facilities under his care"; Arvil Chapman, "the Warden of SCCF" who "is responsible for the maintenance and care of that facility"; and Wanda Spears, "the Librarian of SCCF" who "is responsible for the maintenance and care of the Library at that facility."  *Id.*  Plaintiffs sue the individual Defendants in their official and individual capacities.  *Id.*  Plaintiffs seek declaratory and injunctive relief, as well as "such other relief as it may appear the plaintiff(s) are entitled." *Id.*

The individual Defendants contend that Plaintiffs' claims against them in their individual capacities should be dismissed because *respondeat superior* does not provide a basis for the imposition of liability under 42 U.S.C. § 1983, and Plaintiffs have failed to allege any specific personal involvement by them. Docket Nos. 84, 112. The individual CCA Defendants further contend that Plaintiffs' official capacity claims against them should be dismissed because they are "redundant" since Plaintiffs also sue CCA, in whose shoes they would stand. Docket No. 84. CCA Defendants additionally argue that Plaintiffs' claims against CCA must be dismissed because Plaintiffs have failed to allege that a custom, policy, or practice led to the deprivation of their constitutional rights. *Id.*

With regard to the official capacity claims against the individual TDOC Defendants, those Defendants contend that the official capacity claims against them are essentially claims against the State of Tennessee, which is not a "person" amenable to suit under 42 U.S.C. § 1983. Docket No. 112. TDOC Defendants also argue that the Eleventh Amendment bars Plaintiffs' claims. *Id.*

As to Plaintiffs' due process claim resulting from the alleged property loss of their "hotpots," TDOC Defendants argue that a "prison inmate's claim for the loss of personal property fails to state a cognizable action under 42 U.S.C. § 1983 . . . even if the loss was the result of intentional conduct." Docket No. 112, *citing Parratt v. Taylor*, 415 U.S. 527 at 543-44 (1981); *Hudson v. Palmer*, 468 U.S. 517 (1984). TDOC Defendants further argue that the Sixth Circuit has held that "the Tennessee Claims Commission, a statutory post-deprivation remedy set forth in Tenn. Code Ann. § 9-8-307, *et seq*., adequately satisfies the requirements of due process," such that the implementation of a TDOC policy resulting in a ban of "hotpots" fails to

3

state a § 1983 claim. *Id.*, *citing Brooks v. Dutton*, 751 F.2d 197, 199 (6th Cir. 1985).

CCA Defendants additionally note that Plaintiffs admit that they were provided notice of this policy change and afforded the opportunity to send their "hotpot" home before July 31, 2014, thereby allowing them to continue to own the property but not possess the property within the facility. Docket No. 84. CCA Defendants also maintain that the notice of the policy implementation notified them that any "hotpots" still in their possession at that time would be considered contraband. *Id.* CCA Defendants argue that, because Plaintiffs had notice and an opportunity to send the "hotpots" home or otherwise dispose of them, no property was "taken," and therefore no deprivation occurred. *Id.*

CCA Defendants additionally maintain that they, as "prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policy and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id., quoting Bell v. Wolfish*, 441 U.S. 520, 547 (1979). In particular, CCA Defendants argue that the classification of "hotpots" as contraband in the interest of fire safety and security does not violate Plaintiffs rights as it is within the discretion afforded to them as penological administrators and policy makers. *Id.*

With regard to Plaintiffs' Equal Protection claims, CCA Defendants argue that those claims must be dismissed because Plaintiffs have failed to plead sufficient facts establishing that Defendants treated other similarly situated individuals disparately. *Id.*

As to Plaintiffs' Eighth Amendment conditions of confinement claims, CCA Defendants argue that those claims must be dismissed because Plaintiffs have failed to allege facts sufficient to demonstrate that Defendants were deliberately indifferent to a substantial risk of harm to

Plaintiffs, and have failed "to establish a more culpable state of mind than mere negligence." *Id.*

Regarding Plaintiffs' denial of adequate recreation claim specifically, CCA Defendants contend

that Plaintiffs' claims that they are receiving less time out of their cells because a Tier

Management System ("TMS") was put in place after a three-month lock-down simply does not

rise to the level of a Constitutional violation because Plaintiffs are still receiving recreational

time and they still have access to "showers, telephones, and open communication with other

inmates." *Id.* CCA Defendants further contend that Plaintiffs have failed to allege that

Defendants are acting with deliberate indifference, but rather, have alleged that "Defendants are

actually acting deliberately to protect Plaintiffs' well-being as seen by the measures taken to

ensure Plaintiffs' safety and security through implementing a facility lock-down and the TMS

system that is designed to assist in ensuring the safety and security of the facility." *Id.*

Regarding Plaintiffs' denial of proper nutrition claim in particular, CCA Defendants

assert that Plaintiffs' submitted weekly meal schedule demonstrates that Plaintiffs receive well-

balanced and nutritional meals. *Id.* Defendants further argue that a lack of fruit on the meal plan

does not give rise to a Constitutional violation, and that Plaintiffs again cannot show that

Defendants "acted in any way that shows deliberate indifference to Plaintiffs' needs." *Id.*

With respect to Plaintiffs' "denial of a reasonable expectation of safety due to facility

violence" claim, CCA Defendants argue that Plaintiffs cannot prevail because they have not

alleged that they have personally suffered any physical injury from the allegedly dangerous

conditions of confinement, were personally threatened during alleged violent occurrences, or

"suffered any other type of harm whatsoever." *Id.* CCA Defendants also contend that Plaintiffs'

averments that, during alleged gang violence that resulted in a facility lock-down, "[i]t is reported

men lost their lives" and "many others were transported to medical facilities," are insufficient to establish ether that there was harm or injury to Plaintiffs of which Defendants were to have been aware and disregarded, or that Defendants acted with deliberate indifference to the alleged risk. *Id.* CCA Defendants further argue that Plaintiffs' Complaint, in fact, "sets forth multiple protective measures Defendants instituted to ensure the safety and protection of Plaintiffs, as well as other inmates." *Id.*

As to Plaintiffs' denial of adequate medical care claims, CCA Defendants argue that those claims must be dismissed because Plaintiffs have failed to plead facts showing (1) that they have a serious medical need and (2) that Defendants have been deliberately indifferent to that need. *Id.*

Regarding Plaintiffs' denial of adequate access to the courts claim, CCA Defendants contend that that claim must be dismissed because Plaintiffs have failed to allege facts sufficient to establish that they have, in fact, been denied access to the courts, and that any alleged denial caused their ability to litigate to be prejudiced. *Id.* CCA Defendants assert that Plaintiffs must plead specific prejudice and that conclusory allegations are not enough. *Id.*

As noted, Plaintiffs have filed Responses to both Motions. Responding to the TDOC Defendants' Motion to Dismiss asserting that Plaintiffs' claims against them should be dismissed because: (1) there is no *respondeat superior* liability under 42 U.S.C. § 1983; (2) the Eleventh Amendment bars claims for money damages against State officials acting in their official capacities; (3) the Eleventh Amendment bars claims against State agencies; and (4) Plaintiffs have failed to state a due process claim regarding their alleged property loss, Plaintiffs state:

The Plaintiff(s) do not refute the Defendant's [*sic*] arguments

under points 2 & 3.  They do however disagree and refute their arguments under points 1 & 4.

Docket No. 116, p. 1.[2]

With regard to TDOC Defendants' "point[] 1," Plaintiffs respond:

> The Plaintiff(s) never argued liability under *respondeat superior* in their complaint.  In point-of-fact, they clearly established the Defendant(s) personal involvement.  Points 3, 7, and 8 show that the Defendant(s) are responsible for ensuring that all State of Tennessee Prisons operate according to the appropriate policies and procedures.  Points 16, 21, 29, 36, 48, 60, 79, 80, 94, and 107 also show how the Defendant(s) were personally involved in the stated constitutional violations.  Specifically, the TDOC, Schofield, and Parker write and enforce these policies and procedures, evidenced by the TDOC seal and the Commissioner's name being affixed to each policy.  Accordingly, the Plaintiff(s) have alleged personal involvement . . .

> Surely, the Court will acknowledge that the operation of the SCCF is predicated upon the instructions of their superiors.  As the TDOC, Schofield, and Parker are tasked with overseeing all the State of Tennessee Prisons, it is understandable to assume that they have personal involvement in the daily operations of those prisons. . . .

*Id.*, p. 2.

As to TDOC Defendants' "point ... 4," Plaintiffs respond:

> The Defendant(s) are fully aware that the Plaintiff(s) were not given enough time, between the issuance of the Memorandum and its stated deadline, to pursue Due Process procedures in the form of Inmate Grievances with the administration nor were they able to pursue litigation in the Tennessee Claims Commission.

> . . .

---

[2] The undersigned notes that although Plaintiffs' Response is signed, their supporting Memorandum of Law is not.  Because Plaintiffs are proceeding pro se, however, the undersigned will consider the arguments raised therein.

> The Plaintiff(s) acknowledge that the Tennessee Claims
> Commission offers a possible remedy, however, the Plaintiff(s)
> were attempting to find a remedy prior to losing their property.
> The Tennessee Claims Commission offers a Post-Deprivation
> Remedy and would not have called for the cessation of the
> Defendant(s) actions. . . .

*Id.*, p. 3.

With regard to the arguments raised by the CCA Defendants in their Motion, Plaintiffs

generally respond conclusorily with case law snippets and assert that all arguments raised by

CCA Defendants "should be denied." Docket No. 104. As to the deprivation of their "hotpots,"

Plaintiffs argue that "T.D.O.C. allowed inmates to purchase the hot pots for many years without

any reports of deaths of inmates due to fire that originated and or the source of the incidents

being a hot pot." *Id.*, p. 4.[3]

As to the denial of access to the courts, Plaintiffs argue:

> Librarian Wanda Spears is totally unqualified to operate a prison
> law library. Wanda Spears has no education + formal training in
> Library services further, T.D.O.C policies + procedures which
> inform + regulate rules concerning inmate rights to access the
> courts T.D.O.C. policy # 501.02 During Lock-downs the
> compound law library is closed to inmates specific needs of help in
> filling out the necessary court documents concerning appeals or
> conditions of confinement Librarian Spears has not direct
> supervision to ensure T.D.O.C. policies are strictly followed
> further no punishment for violations of inmate rights.

---

[3] Plaintiffs, in their Response to CCA Defendants' Motion, also argue:

> The Defendant Clinical Services has yet to respond to the
> Petitioner [*sic*] original complaint. Therefore the Petitioner
> respectfully denys [*sic*] any response to this section of the motion
> to dismiss until such a time as the named Defendant has filed
> responsive pleadings.

Docket No. 104, p. 7.

Normal Operational Hours: T.D.O.C. Policy #501.02 § VIC: states the law library shall be open at least 37.5 hours a week. The alleged schedule may meet these requirements "only" in writing Ms. Spears system currently denies access to all inmate population

Library call-out list: An inmates name must be on this list to be let out of his cell (only if the pod officer has time to open your door) This means Ms. Spears selectively picks inmates, she wants in the library. No process to sign-up it is impossible to sign up to be called out when the sign up list is in the library.

The S.C.C.C. inmate handbook states that extended law library passes are available upon request. This alleged extended pass system was eliminated by Ms. Spears to deny inmates access to the courts. The inmate pass system to the library. No forms to fill out in the pods requesting a library pass. Due to the complete lack of education + training in library services. Moreover T.D.O.C. + CCA policies plaintiffs will show at trial Ms. Wanda Spears is unqualified to operate any prison library.

*Id.* at 8-9.

For the reasons set forth below, the undersigned recommends that the instant Motions

(Docket Nos. 83, 111) be GRANTED, and that this action be DISMISSED.

## II. Facts

### A. Allegations of Plaintiff's Complaint

The allegations of Plaintiffs' Complaint, in their entirety, are as follows:

> **A.** **The Violation of the Right to Due Process Litigation as Protected by the U.S. Constitution, Amendment XIV.**
>
> 13. The plaintiff(s) were alerted to a change in the "Approved Inmate Property List" by way of a Memorandum released on June 25, 2014, which was made available to the inmate population of SCCF in July. **(EXHIBIT A)**
>
> 14. According to that Memorandum, the UL2 approved "hotpots" previously purchased by the inmate populations of South Central Correctional Facility would no longer be

allowed at that facility nor at any other State of Tennessee Prison.

15.    According to the same Memorandum, a prospective date of July 31, 2014, was set by which time the "hotpots" were to be completely removed from all State of Tennessee Prisons and any found thereafter would be considered contraband.

16.    The actions of defendant(s) Tennessee Department of Corrections, Corrections Corporation of America, Commissioner Derrick Schofield, Assistant Commissioner Tony C. Parker, President & CEO of CCA Damon Rininger, and Warden of SCCF Arvil Chapman have deprived the plaintiff(s) and all other likewise situated inmates at South Central Correctional Facility of procedural Due Process litigation.

17.    The plaintiff(s) are entitled to Due Process litigation and Equal Protection of the Law in this and other matters.

18.    The plaintiff(s) have a vested property interest in this matter as the "hotpots" were purchased using United States Tender and are thus protected according to the Uniform Commercial Code governing financial transactions.

19.    The value of the "hotpots" being $26.95 per unit, **(EXHIBIT B)**, though minimal in price, is substantial to the plaintiff(s) when compared to their monthly earnings of $40.00, roughly equivalent to 67% of their monthly income.

20.    The plaintiff(s) must work roughly fifteen (15) days to earn the equivalent monetary compensation to afford the purchase of a "hotpot."

21.    Defendant(s) Tennessee Department of Corrections, Corrections Corporation of America, Commissioner Derrick Schofield, Assistant Commissioner Tony C. Parker, President & CEO of CCA Damon Rininger, and Warden of SCCF Arvil Chapman have instructed the plaintiff(s) and the inmate population of SCCF that the reasons for the removal of the "hotpots" is to eliminate the fire safety risk they present.

22.     The fire safety risk they present is circumscribed by the UL3 label affixed to the base of each "hotpot" signifying they are approved for commercial use without a risk of fire hazard.

23.     The defendant(s) are removing the "hotpots" owned by inmates throughout the State of Tennessee and yet are allowing the coffee pots they own to remain.

24.     The "hotpots" and coffee pots are essentially the same, as they consist of a heating plate surrounded by hard plastic which is resistant to heat and a reservoir utilized to house the water which is to be heated.

25.     The "hotpots" were previously allowed at SCCF and were therefore able to be purchased. **(EXHIBIT C)**

26.     The "hotpots" were not previously listed as non-allowable property items. **(EXHIBIT D)**


**B.      The Denial of Adequate Recreation in Violation of the U.S. Constitution, Amendment VIII.**

27.     Beginning between the months of August and September of 2013, SCCF and other State of Tennessee Prisons were placed on lockdown for a three month duration.

28.     Following the cessation of this lockdown, a Tier Management Supervision (herein "TMS") system was put into effect.

29.     The TMS system is designed, according to defendant(s) Tennessee Department of Corrections, Corrections Corporation of America, Commissioner Derrick Schofield, Assistant Commissioner Tony C. Parker, President & CEO of CCA Damon Rininger, and Warden of SCCF Arvil Chapman, to assist in managing the supervision of offenders inside medium and close custody housing units.

30.     The effect of the TMS system is to reduce the number of inmates allowed outside their cells while inside the housing units.

31.   This has a negative effect of reducing the number of hours inmates have access to pod activities, to wit: showers, telephones, open communication with other inmates, etc.

32.   When inmates are confined more than ten (10) hours per day, their cells must have at least twenty-five (25) feet of unencumbered floor space per occupant.

33.   Inmates housed at SCCF are confined with a cell-mate, two (2) per cell.

34.   The cells of SCCF, when viewed in light of the information listed above, are not adequate to support two occupants because the cells contain unmovable furniture which occupies 75% of the floor space.

35.   In order to meet the above requirements, inmates must have pod activities for at least fourteen (14) hours per day.

36.   Defendant(s) Tennessee Department of Corrections, Corrections Corporation of America, Commissioner Derrick Schofield, Assistant Commissioner Tony C. Parker, President & CEO of CCA Damon Rininger, and Warden of SCCF Arvil Chapman have significantly reduced the number of hours inmates have access to pod activities well below the above standard of fourteen (14) hours per day.

37.   In addition, the TMS system severely reduces the number of hours inmates have access to recreation outside of the pods.

38.   The SCCF population is furnished with a Recreation Schedule on a yearly basis which outlines the scheduled recreation activities for each pod. **(EXHIBIT E)**

39.   It identifies when a pod will have access to a particular type of recreation, i.e. Ballfield (BF) or Gym, within a ten (10) day time-frame.

40.   With the TMS system in place, the scheduled recreation activity is cut in half, which as a whole is already insufficient.

12

41.    Coupled with the lack of pod activities, the result is that the inmates of SCCF are forced to endure long days of confinement in cells which are themselves too small to house two (2) inmates.

42.    Additionally, those who are at work during scheduled recreation activities are denied the opportunity to exercise that right.

**C.    The Denial of Proper Nutrition in Violation of the U.S. Constitution, Amendment VIII.**

43.    The inmates of SCCF are forced on a daily basis to endure meals which are not nutritionally adequate.

44.    The inmates of SCCF are supplied with a weekly schedule of planned meals. **(EXHIBIT  F)**

45.    As can be seen by a simple perusing of said menu, there is a noticeable lack of any fruit, a necessary part of a proper and nutritionally adequate diet.

46.    As a direct result of this fact, there are noticeable degradations in the overall health and wellbeing [*sic*] of the inmate population.

47.    These degradations are seen in the increased patient visits to the optometrist due to failing eyesight, etc.

48.    Defendant(s) Tennessee Department of Corrections, Corrections Corporation of America, Commissioner Derrick Schofield, Assistant Commissioner Tony C. Parker, President & CEO of CCA Damon Rininger, Warden of SCCF Arvil Chapman, and Trinity Food Services is responsible for not providing the inmate population of SCCF with a proper and nutritionally adequate diet so as to maintain the overall health and wellbeing [*sic*] of that population.

**D.     The Denial of Adequate Medical Care in Violation of the U.S. Constitution, Amendment VIII.**

49.     The inmates of SCCF are encouraged to utilize the medical visits afforded them.

50.     Yet, it is a proven pattern that medical visits are difficult to take advantage of at SCCF.

51.     In the unlikelihood that an inmate can obtain a medical visit, the chances of finding relief for whatever aliments may afflict that inmate are severely low.

52.     This is due to the fact that the nurses are unable to treat any medical issues and are only able to sign the inmate up to see the appropriate medical staff, i.e. the nurse practitioner or the doctor.

53.     Upon being signed up to see the appropriate medical staff, the time-frame between sign-up and actual visit to that individual is extremely extended, sometimes taking up to three months.

54.     It has often been proven that the inmate must request another medical visit, return to see the nurses, be referred to the same medical staff, and wait again before being seen for even the first time by the appropriate medical staff, all of which extends the time to find relief for aliments by as much as six (6) months.

55.     The inmates are also encouraged to seek emergency medical aid in the likelihood that there is an emergency.

56.     Yet, it has also been proven on many occasions that even emergency medical visits are very difficult to obtain.

57.     More often than not, the inmate is told that their situation is not an emergency and that they must wait until they can request a normal medical visit on another day.

58.     I, Bert Newby # 391297, was referred to the mental health evaluation team in March and April of this year and have yet to see that team.

59. It has been nearly seven (7) months.

60. Defendant(s) Tennessee Department of Corrections, Corrections Corporation of America, Commissioner Derrick Schofield, Assistant Commissioner Tony C. Parker, President & CEO of CCA Damon Rininger, Warden of SCCF Arvil Chapman, and Centurion Medical Provider is responsible for the inability of the inmate population of SCCF to access not only proper and appropriate medical care but also for the lack of correct medication being handed out to those inmates.

**E.      The Denial of a Reasonable Expectation of Safety in Violation of the U.S. Constitution, Amendment VIII.**

61. The inmates of SCCF are continuously subjected to conditions that are extremely unsafe.

62. The previously spoken of 2013 August-September lockdown was a direct result of gang on gang fighting, which began on the campus of SCCF.

63. It is reported that men lost their lives in that incident and many others were transferred to medical facilities with severe injuries, some life-threatening.

64. The staff members of SCCF were unable to contain the incident before damage had been done.

65. This is only one example of the daily occurrences at SCCF.

66. There are numerous accounts, which are growing in number and size, of inmate on inmate and inmate on staff violence.

67. Additionally, the inmates of SCCF are subjected to a very possible death scenario.

68. As is well known in the corrections circles, the electronic doors of the cells at SCCF are operated by a central control booth located in each building.

69. That central control booth is responsible for operating the

locking mechanisms on the cell doors in the two pods connected to it.

70. Each pod houses roughly between one-hundred-and-twenty-five (125) and one-hundred- and-fifty (150) inmates.

71. Each housing unit, consisting of two (2) pods, houses the equivalent of two-hundred-and-fifty (250) to three-hundred (300) inmates.

72. There are five (5) housing units on the campus of SCCF and one (1) segregation unit.

73. At any given time, pending fluctuations in the population, there are between one-thousand-and-five-hundred (1500) and one-thousand-and-eight-hundred (1800) inmates housed at SCCF.

74. The risk posed to those inmates is found in that the central control booths do not operate any longer and therefore the locking mechanisms are no longer electronically controlled.

75. The button found on the inside of the cells which allows the inmates to open their doors from the inside following the cessation of count-time no longer works as a direct result.

76. The cell doors must be manually opened by the one (1) correctional officer in charge of each pod.

77. Should a fire ever break out, the inmate population of SCCF is at risk of suffering either severe injuries or even death.

78. This is a daily occurrence as the central control booths, nonoperational for nearly two (2) years, have yet to be fixed or the problem resolved.

79. Defendant(s) Tennessee Department of Corrections, Corrections Corporation of America, Commissioner Derrick Schofield, Assistant Commissioner Tony C. Parker, President & CEO of CCA Damon Rininger, and Warden of SCCF Arvil Chapman are each responsible for this lack of

a reasonable expectation to safety.

### F. The Exposure to Dangerous and Volatile Chemicals in Violation of the U.S. Constitution, Amendment VIII.

80. Recently, and in accordance with the request of defendant(s) Tennessee Department of Corrections, Corrections Corporation of America, Commissioner Derrick Schofield, Assistant Commissioner Tony C. Parker, President & CEO of CCA Damon Rininger, and Warden of SCCF Arvil Chapman, the inmates of SCCF were required to paint the walls, furniture, and doors of their cells and pods.

81. They were not provided with any type of respiratory device or protection from the contents of the paint used to accomplish the required task.

82. The paint label affixed to the container shows that the paint is extremely dangerous and volatile. **(EXHIBIT G)**

83. Prolonged exposure to this product is shown to cause kidney and/or liver damage.

84. The inmates of SCCF are constantly in contact with this substance.

85. The product contains Crystalline Silica which can cause lung cancer or silicosis.

86. The risk depends on the duration and level of exposure.

87. The inmates, during the process of painting, were exposed to the vapors of this product and skin contact for hours on end.

88. Many times there was no ventilation in the pods while as much as one-quarter (1/4) of the pod population was engaged in painting.

89. The vapors were left to build in the pods without any way of escape, resulting in headaches, blurred vision, vomiting,

etc.

90.     Eye watering, headaches, nausea, dizziness, loss of coordination, etc. indicates that the vapor level were [*sic*] too high.

91.     The label itself states that adequate ventilation must be utilized.

92.     Additionally, it is suggested that protective equipment as specified on the MSDS, including NIOSH-approved air purifying respirators with the appropriate chemical cartridges or a positive-pressure, air-supplied respirators be utilized when painting with that particular brand of paint.

93.     The inmates of SCCF were not at any time afforded such privileges.

94.     Defendant(s) Tennessee Department of Corrections, Corrections Corporation of America, Commissioner Derrick Schofield, Assistant Commissioner Tony C. Parker, President & CEO of CCA Damon Rininger, and Warden of SCCF Arvil Chapman are each responsible for this exposure to dangerous and volatile chemicals.


**G.      The Violation of the Right of Adequate Access to the Courts as Protected by the U.S. Constitution, Amendment XIV.**

95.     Consistently, the Library of the South Central Correctional Facility provides less than adequate access to the courts for the inmates of that facility.

96.     The Library is supposed to be open at least thirty-seven and a half (37.5) hours per week, yet the Library does not abide by that responsibility.

97.     The Library, scheduled to be open Monday through Saturday, closes whenever the Education Department closes, sometimes multiple times during the month, and even closes when the Institution is hosting a special event for the staff members.

98.    Additionally, the Library reserves Saturday for those who are involved in the Institution's Drug Rehabilitation Unit (R-DAP), and does not allow anyone else to attend. This severely limits the access of those inmates who work Monday through Friday, as a pass to the Library does not excuse you from your job responsibilities and therefore cannot interfere with your job performance.

99.    Anyone who is currently involved in litigation of any kind, majority of whom are litigating their criminal cases, are consistently subjected to sub-par standards and are denied adequate access to the legal services of the Library, thus hindering their ability to properly access the courts.

100.    Lastly, those inmates who are housed in the Segregation Unit (HSA) are also denied access to legal services.

101.    Those inmates are provided with legal services through the utilization of the legal clerks who work for the Library.

102.    The legal clerks are allowed access to HSA only twice a week.

103.    Many times, those same clerks are delayed for hours and are sometimes not even allowed to enter HSA due to the shortage in staff members.

104.    The law books that are available for check-out to the inmates housed in HSA have to be distributed by the legal clerks, therefore access to books is denied.

105.    The Lexis Nexis software which has been made available to the inmates of SCCF, including those in HSA, is often times out-of-date.

106.    The inmates housed in HSA are denied even adequate access to the out-of-date Lexis Nexis software because of the shortage of staff members as the only way they can access that system is if there is a free staff member who will escort them to the proper room and supervise them while they use that system.

107.    Defendant(s) Tennessee Department of Corrections,

> Corrections Corporation of America, Commissioner
> Derrick Schofield, Assistant Commissioner Tony C. Parker,
> President & CEO of CCA Damon Rininger, Warden of
> SCCF Arvil Chapman, and Librarian Wanda Spears are
> each responsible for this denial of adequate access to the
> courts.

Docket No. 38 (emphasis original).

## III. Analysis

### A. Fed. R. Civ. P. 12b(6) - Motions to Dismiss

Fed. R. Civ. P. 12(b)(6) provides that a claim may be dismissed for failure to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory. *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice. *Id.* A complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient. *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007). The "[f]actual allegations must be enough to raise a right to relief above the speculative level"; they must "state a claim to relief that is plausible on its face." *Id.* At 1965, 1974. *See also, Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007).

Moreover, the United States Supreme Court has recently addressed the appropriate standard that must be applied in considering a Motion to Dismiss for failure to state a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The *Iqbal* Court stated in part as follows:

> Two working principles underlie our decision in *Twombly*. First,
> the tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions.
Threadbare recitals of the elements of the cause of action,
supported by mere conclusory statements, do not suffice . . . . Rule
8 marks a notable and generous departure from the hyper-technical,
code-pleading regime of a prior era, but it does not unlock the
doors of discovery for plaintiff armed with nothing more than
conclusions.  Second, only a complaint that states a plausible claim
for relief survives a motion to dismiss . . . . Determining whether a
complaint states a plausible claim for relief will, as the Court of
Appeals observed, be a context-specific task that requires the
reviewing court to draw on its judicial experience and common
sense. . . . But where the well-pleaded facts do not permit the court
to infer more than the mere possibility of misconduct, the
complaint has alleged - but it has not "show[n]" - "that the pleader
is entitled to relief."

556 U.S. at 678-79 (citations omitted).

## B.  42 U.S.C. § 1983

Plaintiffs essentially allege violations of their First, Eighth, and Fourteenth Amendment

rights pursuant to 42 U.S.C. § 1983.  *See* Docket No. 38.  Section 1983 provides, in part, that:

Every person who, under color of any statute, ordinance,
regulation, custom, or usage, of any State or Territory or the
District of Columbia, subjects, or causes to be subjected, any
citizen of the United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges, or immunities
secured by the Constitution and laws, shall be liable to the party
injured in an action at law, suit in equity, or other proper
proceeding for redress...

Thus, in order to state a claim under § 1983, a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S.

42, 48, 108 S. Ct. 2250, 2254-55 (1988)*, citing Parratt v. Taylor,* 451 U.S. 527, 535, 101 S. Ct.

1908, 1913, 68 L. Ed. 2d 420 (1981) (overruled in part on other grounds, *Daniels v. Williams,*

474 U.S. 327, 330-331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S. Ct. 1729, 1733, 56 L. Ed. 2d 185 (1978). The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 49, 108 S. Ct. 2255*, quoting United States v. Classic,* 313 U.S. 299, 326, 61 S. Ct. 1031, 1043, 85 L. Ed. 1368 (1941).

## C. The Case at Bar

### 1. TDOC and Individual TDOC Defendants

#### a. TDOC

TDOC, as the Tennessee Department of Correction, is a department of the State of Tennessee. A suit against TDOC is, therefore, a suit against the State of Tennessee.

In order to state a viable claim under 42 U.S.C. § 1983, Plaintiffs must allege that they were deprived of a right, privilege, or immunity secured by the Constitution or law of the United States by a *person* acting under color of law, without due process of law. *Flagg Brothers Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Chatman v. Slagle*, 107 F.3d 380, 384 (6th Cir. 1997); *Brock v. McWherter*, 94 F.3d 242, 244 (6th Cir. 1996). The State of Tennessee is not a "*person*" amenable to suit under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

Additionally, the State of Tennessee has not waived its immunity under the Eleventh Amendment with respect to civil rights suits. *ACLU v. Tennessee*, 496 F.Supp. 218 (M.D. Tenn. 1980). For these reasons, Plaintiffs' claims against TDOC should be dismissed.

#### b. Individual TDOC Defendants - Official Capacity Claims

In complaints alleging federal civil rights violations under § 1983, "[a]n official capacity

claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents." *Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000) (*citing Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). *See also, Frost v. Hawkins County Bd. of Educ.*, 851 F.2d 822, 827 (6th Cir. 1988). As such, when a public employee is sued in his or her official capacity, the claims are essentially made against the public entity. *Id*. Because the individual TDOC Defendants are employees of TDOC, they stand in the shoes of their employer, the State of Tennessee. As discussed above, Tennessee has not waived its immunity from civil rights actions, and the State of Tennessee is not a "person" amenable to suit under § 1983. *See ACLU*, 496 F.Supp. 218; *Will*, 491 U.S. at 71. Accordingly, the individual TDOC Defendants are not "persons" subject to suit in their official capacities, and Plaintiffs' official capacity claims against them should be dismissed.

### c. Individual TDOC Defendants - Individual Capacity Claims

42 U.S.C. § 1983 does not provide for the imposition of liability based upon a theory of *respondeat superior. Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-94 (1978). In order to establish individual liability under § 1983, therefore, Plaintiffs must demonstrate that Defendants either directly participated in the activity that allegedly violated their Constitutional rights, or personally authorized, approved, or acquiesced in such activity. *See, e.g., Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984); *Dunn v. State of Tennessee*, 697 F.2d 121, 128 (6th Cir. 1983); *Hays v. Jefferson County*, 668 F.2d 869 (6th Cir. 1980). Plaintiffs must allege "a causal connection between the misconduct complained of and the official sued" (*Dunn*, 697 F.2d at 128), and must present affirmative evidence that Defendants violated their rights; conclusory allegations are not enough (*see Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.

1989)). *See also, Anderson,* 477 U.S. at 257; *Nix v. O'Malley,* 160 F.3d 343, 347 (6th Cir. 1998); *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990); *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir. 1990).

As can be seen in the factual allegations recounted above, Plaintiffs have failed to allege that individual TDOC Defendants Schofield or Parker have been either personally involved in, or personally authorized, approved, or acquiesced in the allegedly violative conduct of which Plaintiffs complain. Rather, the entirety of Plaintiffs' allegations against Defendants Schofield and Parker involve the fact that they hold senior TDOC positions and, as part of their jobs, implemented a TDOC policy. As noted, Defendants Schofield and Parker cannot be held liable simply due to their supervisory positions. Plaintiffs' lack of allegations that Defendants Schofield and Parker were personally involved in, authorized, approved, or acquiesced in the allegedly unconstitutional conduct is fatal to their claim. Accordingly, the individual capacity claims against the individual TDOC Defendants should be dismissed.

**2. CCA and Individual CCA Defendants**

**a. CCA**

CCA is a private company that contracts with the State to run penal facilities. A private corporation that performs the traditional state functions of operating a prison acts under the color of state law for purposes of § 1983. *Street*, 102 F.3d. At 814. CCA can, therefore, be held liable under § 1983 if Plaintiffs can demonstrate that their constitutional rights were violated as a direct result of a CCA policy, practice, or custom. *Monell*, 436 U.S. at 694.

As can be seen in Plaintiffs' factual allegations recounted above, Plaintiffs do not allege that any particular CCA policy, practice, or custom violated their rights. Absent such allegations,

Plaintiffs cannot sustain their claims against CCA and those claims should be dismissed.

### b. Individual CCA Defendants - Official Capacity Claims

As discussed above, in complaints alleging federal civil rights violations under § 1983, "[a]n official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents." *Claybrook*, 199 F.3d at 355 n.4 (*citing Graham*, 473 U.S. at 165). *See also, Frost*, 851 F.2d at 827. As such, when a public employee is sued in his or her official capacity, the claims are essentially made against the public entity. *Id*. As employees of CCA, the individual CCA Defendants stand in the shoes of CCA. Because Plaintiffs cannot sustain their claims against CCA, their official capacity claims against the individual CCA Defendants should be dismissed.

### c. Individual CCA Defendants - Individual Capacity Claims

As discussed above, § 1983 does not provide for the imposition of liability based upon a theory of *respondeat superior* (*Monell,* 436 U.S. at 691-94); rather, in order to establish individual liability under § 1983, Plaintiffs must demonstrate that Defendants either directly participated in the activity that allegedly violated their Constitutional rights, or personally authorized, approved, or acquiesced in such activity (*see, e.g., Bellamy*, 729 F.2d at 421; *Dunn*, 697 F.2d at 128; *Hays*, 668 F.2d at 869). Plaintiffs must allege "a causal connection between the misconduct complained of and the official sued" (*Dunn*, 697 F.2d at 128), and must present affirmative evidence that Defendants violated their rights; conclusory allegations are not enough (*see Street*, 886 F.2d at 1479).

As can be seen in the factual allegations recounted above, Plaintiffs have failed to allege that individual CCA Defendants Chapman, Spears, or Hininger personally authorized, approved,

or acquiesced in the allegedly violative conduct of which Plaintiffs complain.  Rather, the entirety of Plaintiffs' allegations against Defendants Chapman, Spears, and Hininger involve the fact that they hold senior positions.  As noted, Defendants Chapman, Spears, and Hininger cannot be held liable simply due to their supervisory positions.  Plaintiffs' lack of allegations that Defendants Chapman, Spears, and Hininger were personally involved in, authorized, approved, or acquiesced in the allegedly unconstitutional conduct is fatal to their claim.  Accordingly, the individual capacity claims against the individual CCA Defendants likewise should be dismissed.

### 3.  Clinical Services

As has been noted, Clinical Services had not been served as of the date of the filing of the instant Motions and is not a party to these Motions.  The undersigned notes, however, that the allegations of Plaintiffs' Complaint, taken as true, fail to state a claim against Clinical Services because Plaintiffs fail to levy specific claims against it.[4]  As explained above, the absence of specific allegations against Clinical Services is fatal to Plaintiffs claim.

The Court may act sua sponte to dismiss an action that fails to state a claim upon which relief can be granted.  28 U.S.C. §1915(e)(2).[5]

_____

[4] As noted, Clinical Services is a substitute party for Centurion Medical Services. Plaintiffs' Complaint fails to levy specific allegations against either Clinical Services or Centurion Medical Services.  *See* Docket No. 38.

[5] 28 U.S.C. § 1915(e)(2) provides:

> Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that-
>
> (A) the allegation of poverty is untrue; or
>
> (B) the action or appeal-

Because Plaintiffs' Complaint fails to levy specific allegations against Clinical Services, the undersigned therefore recommends that Plaintiff's claims against it also be dismissed.

## IV.  Conclusion

For the reasons discussed above, the undersigned recommends that the instant Motions (Docket Nos. 83, 111) be GRANTED, and that this action be DISMISSED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court.  Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections.  Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), reh'g denied, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge

---

(i) is frivolous or malicious;

(ii) fails to state a claim on which relief may be granted; or

(iii) seeks monetary relief against a defendant who is immune from such relief.